## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

MICHAEL E. LEITHAUSER,                    :

      Plaintiff,                          :      Case No.  3:10cv00294

vs.                                       :      District Judge Walter Herbert Rice
                                                 Magistrate Judge Sharon L. Ovington
MICHAEL J. ASTRUE,                        :
Commissioner of the Social
Security Administration,                  :

      Defendant.                          :


===============================================================

## REPORT AND RECOMMENDATIONS[1]

===============================================================


### I.      INTRODUCTION

Plaintiff Michael Leithauser brings this case challenging the Social Security

Administration's denial of his application for Disability Insurance Benefits (DIB). This

Court has jurisdiction to review the administrative denial of his DIB application.  *See* 42

U.S.C. §§405(g), 1383(c)(3).

This case is before the Court upon Plaintiff's Statement of Errors (Doc. #8), the

Commissioner's Memorandum in Opposition (Doc. #12), the administrative record, and

the record as a whole.

---

[1]  Attached hereto is a NOTICE to the parties regarding objections to this Report and
Recommendations.

Plaintiff asserted in administrative proceedings that he was eligible to receive DIB because he was under a "disability," as defined by the Social Security Act. In the present case, Plaintiff seeks an Order reversing the Commissioner's non-disability decision, as well as granting him benefits from July 6, 2004. In the alternative, Plaintiff requests this case be remanded to the Social Security Administration in order to correct certain errors. The Commissioner contends that an Order affirming the ALJ/Appeal Council's decision is warranted.

## II.    BACKGROUND

### A.    <u>Procedural History</u>

Plaintiff filed his DIB application on May 12, 2005, asserting that he has been under a "disability" since July 6, 2004, as a result of carpal tunnel syndrome, epicondylitis, and asthma. (Tr. 83-85, 98).

Following initial administrative denials of his application, Plaintiff received a hearing before Administrative Law Judge (ALJ) David A. Redmond on June 13, 2008. During this hearing, Plaintiff, as well as a vocational expert (VE), appeared and testified. (Tr. 428-46).  Subsequently, on August 4, 2008, ALJ Redmond held another hearing with Plaintiff present, in order to take additional testimony from the VE. (Tr. 448-54). ALJ Redmond issued a written decision dated September 16, 2008, concluding that Plaintiff was not under a disability since he remains capable of performing a significant number of jobs in the national economy. (Tr. 13-23).

Plaintiff requested the Appeals Council review the ALJ's decision, and submitted

additional evidence. (Tr. 8). After considering Plaintiff's additional evidence, as well as the evidence originally considered by ALJ Redmond, the Appeals Council denied Plaintiff's request for review. (Tr. 5-7). Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

### B.     Plaintiff's Vocational Profile and Testimony

Plaintiff was thirty-five years old on his alleged disability onset date.  Accordingly, he is considered a "younger individual" for purposes of resolving his DIB claim.  *See* 20 C.F.R. §404.1563(c); *see also* Tr. 21.  Plaintiff has a high-school education and completed two years of college.  (Tr. 103).  He has prior work experience as an assembly line worker, forklift operator, and painter. (Tr. 21, 99).

Plaintiff testified at the administrative hearing that he is single and lives by himself in his house.  (Tr. 431).  He has a driver's license but driving causes him pain in his left leg, elbows, hands, and back, so he only drives short distances. (Tr. 432-33). Plaintiff currently receives approximately $2,200 per month from long-term disability insurance. (Tr. 433).

Plaintiff's last job was as a production associate at Honda. (Tr. 433-34). His responsibilities consisted of installing parts on cars and working with various types of tools, including air guns. (Tr. 434). Plaintiff testified that he stopped working at Honda in July 2004 because of complications from carpal tunnel surgery and epicondylitis. (Tr. 434). Plaintiff explained that Honda gave him an ultimatum after his surgery: obtain permission from a doctor to return to his position without restrictions, or go home and

3

collect disability benefits. *Id.*

Plaintiff reported that he cannot stand for more than ten to fifteen minutes at a time due to problems with his left leg. (Tr. 435). Plaintiff testified the problem with his left leg and ability to stand stem from an injury he suffered as a victim of an attempted robbery in 2005. *Id.* During this incident, Plaintiff was pushed down by the assailant and broke his ankle and fibula. *Id.* Subsequently, Plaintiff has undergone five surgeries related to this injury. *Id.* Plaintiff also reported that he still suffers from carpal tunnel and epicondylitis in his elbows. *Id.* Plaintiff has had surgery on both hands but testified that he has been informed additional surgery would make them worse. *Id.*

In addition to the problems with his hands, elbows, and left leg, Plaintiff testified he also has three herniated discs in his back, a spur in one of his vertebra, and spinal stenosis. (Tr. 436). Plaintiff further reported that he suffers from asthma, depression, and anxiety. (Tr. 437). When sitting, Plaintiff experiences pain and needs to stand up briefly. (Tr. 438). His hands are numb from six to eight hours a day, and when not numb, they constantly hurt. (Tr. 439). Likewise, Plaintiff testified his elbows "feel like somebody cracked them with a ball bat or something," and they feel particularly painful when it is going to rain. *Id.*

Plaintiff stated he has not lifted more than five pounds in four years. *Id.* He does all the household chores, although is only able to do them for ten minutes before needing to sit for an hour. *Id.* Plaintiff has friends he sees a couple of times a week, and they usually watch television together or sit on his deck and talk. (Tr. 440).

4

As to his daily activities, Plaintiff testified that he typically wakes up around eight o'clock in the morning, and then watches some television. *Id.* After this, Plaintiff will do any dishes or laundry that needs to be done, then he will go outside and sit in the sun while he writes checks and pays his bills. *Id.* Plaintiff also talks to his girlfriend and daughter on the phone, and he watches television in the evening before going to bed. (Tr. 441).

## C.  <u>Medical Records Submitted Before the ALJ's Decision</u>

Plaintiff's medical issues arose approximately in 1999, with complications involving his left elbow. (Tr. 168). Plaintiff underwent message therapy treatments for his left elbow symptoms and had no recurrence until 2002. *Id.*  At this time, Plaintiff again started to experience pain in his left elbow, as a result of the repetitive nature of the work he was performing at Honda. *Id.* Plaintiff again started message therapy to alleviate the pain and symptoms in his left elbow, however, he reported only minimal relief. *Id.* In addition, Plaintiff was given work restrictions and prescribed anti-inflammatory medication. *Id.* Dr. Lappert, the physician who evaluated Plaintiff on March 20, 2002, opined that there was "slight improvement in [Plaintiff's] symptomology." *Id.*
An MRI in August 2002 of the left elbow indicated the existence of some non-acute scar tissue, but showed "[n]o evidence of medial or lateral epicondylitis," and "Osseous structures intact." (Tr. 182). In December 2002, a nerve conduction study showed "moderate left carpal tunnel syndrome." (Tr. 174).

In January 2003, James Nappi, M.D., performed carpal tunnel release surgery on

5

Plaintiff's right hand. (Tr. 319). Dr. Nappi opined that the "operation was carried out and tolerated . . . well." *Id.* A month later, in February 2003, Dr. Nappi stated Plaintiff's "[g]rip and range of motion are improving very nicely as expected," and Plaintiff "is ready to proceed with his opposite CTR over the next weeks' time, as his grip is better on the right." *Id.* Accordingly, in March 2003, Plaintiff underwent carpal tunnel release surgery on his left hand, and again tolerated it well. (Tr. 316). Dr. Nappi noted in April 2003 that Plaintiff was "progressing well at present," and was "okay[] to progress to a transition work program." *Id.*

In May 2003, examination of Plaintiff conducted by Kimberly Seth, M.D., indicated "the right elbow and wrist reveal[] full range of motion without restriction," and "minimal tenderness to the bilateral epicondylar area and minimal tenderness to resisted extension of the fingers." (Tr. 187). Dr. Seth advised that Plaintiff should continue with the current work restrictions and anti-inflammatories. *Id.* During another exam in June 2003, Dr. Seth indicated Plaintiff's "left elbow reveals full range of motion without restriction." (Tr. 184). Dr. Seth also indicated Plaintiff has "reached his maximum medical improvement on the left elbow after physical therapy, injections and surgery on the carpal tunnel." *Id.* In addition, Dr. Seth indicated that "[e]xamination of the left elbow reveals full range of motion without restriction," and "only minimal tenderness of the lateral epicondylar area with only minimal tenderness to resisted extension of the fingers." *Id.* Likewise, Dr. Seth stated that Plaintiff had "[n]ormal sensation, [and] good grip strength." *Id.* However, Plaintiff at this time also continued to report having left

6

elbow pain, especially with arms extended. *Id.*

In February 2004, Bhaskar K.V. Reddy, M.D., performed an impairment evaluation of Plaintiff. (Tr. 201-2). In this evaluation, Dr. Reddy opined that he did not see any scarring, swelling, effusion, or deformities of the right elbow. *Id.* Dr. Reddy did note "tenderness over the lateral epicondyle on palpation." *Id.* Ultimately, Dr. Reddy determined Plaintiff "qualifies for 7% total whole person impairment for this claim." (Tr. 202).

In April 2004, Matthew D. McDaniel, M.D., performed an independent medical examination of Plaintiff. (Tr. 279-83). Dr. McDaniel's examination of Plaintiff's right elbow showed that "range of motion of the right elbow was normal but painful." (Tr. 282). Further, Plaintiff's "right wrist and hand revealed a well-healed carpal tunnel scar in the usual location," and "[p]inch and grip strength were normal." Likewise, Dr. McDaniel indicated that Plaintiff's left elbow "range of motion was normal but painful." *Id.* Plaintiff's "[p]inch and grip strength were normal." *Id.* Based on his examination, Dr. McDaniel opined, "within a reasonable degree of medical certainty" that Plaintiff "has reached maximum medical improvement for the allowed right carpal tunnel syndrome and right wrist strain . . . and it is unlikely that any further treatment will result in a fundamental change in the status of his condition." *Id.* Dr. McDaniel also stated that "[w]ith respect to the allowed right lateral epicondylitis, there are continued subjective complaints and objective findings consistent with this diagnosis." (Tr. 283).

In April 2004, Dr. Nappi evaluated Plaintiff again. (Tr. 312). At this time, Dr.

7

Nappi noted that Plaintiff, who has not been seen for a year, "is complaining of recurrent carpal tunnel type symptoms with resumption of air gun operation although his Phalen's bilaterally are negative." Dr. Nappi further opined that Plaintiff "is diffuse in his symptoms. He is also complaining of significant re-flaring of his lateral epicondyles and is requesting info on shock treatments." *Id.* As a result, Dr. Nappi recommended Plaintiff visit Dr. Cook for a second opinion regarding both of his elbows and carpal tunnel syndrome. *Id.*

A May 2004 examination of Plaintiff, performed by Nancy Renneker, M.D., indicated that Plaintiff, "[b]ased on the 5th Edition of the AMA Guides to the Evaluation of Permanent Impairment . . . has a 20% whole person impairment . . . ." (Tr. 221). Plaintiff informed Dr. Renneker that he had returned to work with restrictions in April 2003, and began a gradual return to work in October 2003. (Tr. 219). At the time of the examination, Plaintiff reported "that with his restrictions he now is on a temporary work assignment of driving cars off the line." (Tr. 220). Plaintiff complained to Dr. Renneker that he suffers from constant stiffness and swelling in his right elbow and wrist, as well as constant pain in his elbow, right hand numbness and parasthesia, weakness in his right forearm, wrist, and hand, and numbness in his right fingers. (Tr. 220).  Dr. Renneker indicated there was tenderness in Plaintiff's right wrist and right elbow, as well as limited range of motion in the right elbow and wrist. (Tr. 220-21). Dr. Renneker also observed partial sensory loss with reduced strength in the fingertips, but normal strength, reflexes and sensation in the upper extremities, and a 59% decrease in right hand grip strength.

8

(Tr. 221). Ultimately, Dr. Renneker concluded Plaintiff has a 20% whole person impairment. *Id.*

As a result of Dr. Nappi's recommendation in April, in June 2004, Paul A. Cook, M.D., examined Plaintiff. (Tr. 311). During this examination, Dr. Cook indicated that Plaintiff "demonstrates full elbow, forearm, wrist and finger range of motion." *Id.* Dr. Cook further opined that Plaintiff "has minimal to no pain with lateral collateral ligament stress" and "stability both of the medial and lateral plates of both elbows." *Id.* Nonetheless, Dr. Cook also indicated that Plaintiff has tenderness over his lateral epicondyle, and that "ECRB stress and radial wrist extensor stress is tender bilaterally." *Id.* Ultimately, Dr. Cook recommended Plaintiff change his job, obtain occasional injections, and take anti-inflammatories. *Id.* Dr. Cook also indicated that a previously conducted MRI demonstrates right lateral epicondylitis, but is unremarkable on the left. *Id.*

In January 2005, John R. Orban, P.T., performed a functional capacity evaluation of Plaintiff. (Tr. 225-26). During this evaluation, Plaintiff completed twenty-six test items, and exhibited a reasonable amount of effort "due to the amount of pain that he was experiencing in his elbows." *Id.* Although Mr. Orban noted "the pain did have a negative impact on overall testing outcome, especially in the lifting and carrying activities as well as the pushing and pulling activities," *id.*, he also stated that Plaintiff's "abilities would place him in a medium physical demand level of work for the frequent and continuous time frames for both horizontal lifting and two-hand carrying." *Id.* Mr. Orban further

stated that Plaintiff's "physical demand level of work would be categorized as light for all of the other lifting and carrying activities," and that he "did not have any problems with walking, stair climbing or balancing." *Id.*

In February 2005, Plaintiff visited Charles B. May, D.O., with complaints of constant pain in the left elbow, especially when gripping or lifting. (Tr. 335). Dr. May observed Plaintiff had "full range of motion of the left elbow and left wrist without crepitus or effusion," but also tenderness and diminished sensation in the left hand and elbow. (Tr. 335). The Tinel's sign was negative but Phalen's were positive on the left hand. (Tr. 336). Tinel's were positive over the left elbow. *Id.* X-rays did not reveal any traumatic osseous pathology of the left wrist and left elbow. *Id.* At this time, Dr. May released Plaintiff to return to work with restrictions, and ordered an EMG with nerve conduction studies of the left upper extremity as necessary. *Id.* EMGs were subsequently completed in April 2005 and indicated "a mild recurrent carpal tunnel syndrome" with no denervation seen. (Tr. 324). Accordingly, Dr. May recommended that Plaintiff schedule a follow up with Dr. Nappi in order to determine if repeat carpal tunnel release surgery would be necessary. (Tr. 330).

In June 2005, Steven S. Wunder, M.D., performed an independent medical examination of Plaintiff. (Tr. 256-62). Dr. Wunder stated that Plaintiff "indicates he can lift up to 10 pounds but 20 pounds causes him increased pain." (Tr. 258). After evaluating Plaintiff's medical records, Dr. Wunder concluded, "within a reasonable degree of medical certainty" that Plaintiff has reached "maximum medical improvement," and

"[t]here are no plans for further surgical intervention." (Tr. 261). Dr. Wunder also indicated, based on his findings, that "there would be no reason for temporary total disability from 03/21/05 to 08/18/05 causally related to the allowed conditions in this claim." (Tr. 262). Dr. Wunder opined "[t]he only recommendation has been activity modification which was also advised over a year ago." *Id.*

Plaintiff relies on the opinion of his treating physician, Charles B. May, D.O. Plaintiff was treated by Dr. May from February 17, 2005 through November 1, 2007. (Tr. 325-338, 385-388).

In July 2005, Dr. Charles Derrow, a state agency physician, reviewed Plaintiff's medical records and stated Plaintiff could perform medium work with limited use of fingers for fine manipulation, and limited climbing of ladders, ropes, and scaffolds. (Tr. 285-90). Subsequently, in January 2006, state agency physician, Teresita Cruz, M.D., reviewed and affirmed Dr. Derrow's findings. (Tr. 291, 346).

In August 2005, Dr. May responded to a request from Honda for information clarifying Plaintiff's medical request at work. (Tr. 327). In his response, Dr. May indicated that Plaintiff would not be able to perform his past work and would not be able to return to it; had not reached his maximum medical recovery; suffered from a condition that would continue, with reasonable probability, for an indefinite period of time; required steroid injections; and was able to perform other less physically demanding employment, with restrictions implemented in April 2005 by another physician. (Tr. 328). A subsequent EMG performed in September 2005 on Plaintiff's left hand, showed

11

evidence of mild, recurrent carpal tunnel syndrome, and no denervation. (Tr. 323).

**D.** **Additional Medical Records Submitted After the ALJ's Decision**[2]

In August 2007, Dr. May opined that Plaintiff "is unemployable," and "certainly could not perform any type of repetitive work even in a light or sedentary range with either upper extremity." (Tr. 49). Dr. May also stated that Plaintiff "would have significant restrictions as far as standing, walking, climbing, crawling, and lifting because of his left ankle injury and subsequent impairment." *Id.* In Dr. May's medical opinion, Plaintiff "is permanently and totally disabled from any form of substantial gainful employment as a result of his current physical condition." *Id.*

Plaintiff also relies on the opinion of examining physician Richard Ward, M.D. (Tr. 51-54A, 394-398). After examining Plaintiff in July 2007, Dr. Ward opined that "based upon a reasonable medical probability, [Plaintiff] is incapable of returning to substantial gainful employment . . . ." (Tr. 52).

Plaintiff also provides the opinion of another physician, Beal D. Lowe, Ph.D., who examined him on two separate occasions. (Tr. 421-423, 426). Dr. Lowe stated that Plaintiff "lacks capacity to perform any employment as a result of his inability to use his hands for any repetitive movement (e.g. keyboarding, manipulating or writing), his very limited standing, walking and sitting tolerances and the reported probability that his conditions, especially his left ankle, will only worsen with time." (Tr. 423).

---

[2]After ALJ Redmond issued his decision on September 16, 2008, Plaintiff submitted the following additional evidence for consideration by the Appeals Council.

In May 2007, Lee Howard, Ph.D., performed a comprehensive psychological examination of Plaintiff and opined that, although Plaintiff suffers from depression which results in a 30% permanent partial impairment, "return[ing] to productive work activity in a sedentary position via retraining . . . appears to be a viable goal." (Tr. 416).

In May 2008, an MRI of Plaintiff's spine showed "[s]evere central spinal stenosis at L4-5 where there is also a very small right central disk herniation," as well as, "[s]mall central disk herniation at L5-S1." (Tr. 393).

## III.    ADMINISTRATIVE REVIEW

### A.    "Disability" Defined

The Social Security Administration provides DIB to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York*, 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §423(a)(1)(D). The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope. It encompasses only those who suffer from a medically determinable physical or mental impairment severe enough to prevent them from engaging in substantial gainful activity. *See* 42 U.S.C. §423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70. A DIB applicant bears the ultimate burden of establishing that he or she is under a "disability." *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

The term "disability" – as defined by the Social Security Act – carries a specialized meaning of limited scope. Narrowed to its statutory meaning, a "disability"

13

includes only physical or mental impairments that are "medically determinable" and severe enough to prevent the claimant (1) from performing his or her past job, and (2) from engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

**B.    Social Security Regulations**

The Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* Tr. 21-26; *see also* 20 C.F.R. §404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), the complete sequential review answers five questions:

1.    Has the claimant engaged in substantial gainful activity?

2.    Does the claimant suffer from one or more severe impairments?

3.    Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments (the Listings), 20 C.F.R. Subpart P, Appendix 1?

4.    Considering the claimant's residual functional capacity,[3] can he perform his past relevant work?

5.    Considering the claimant's age, education, past work experience, and residual functional capacity, can he or she perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279

---

[3] The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations. 20 C.F.R. §404.1545(a); *see Howard v. Comm'r. of Social Security*, 276 F.3d 235, 239 (6th Cir. 2002).

14

F.3d 348, 354 (6th Cir. 2001).

### C.     ALJ Redmond's Decision

ALJ Redmond's pertinent findings began at Step 2 of the sequential evaluation, where he concluded that Plaintiff had the following severe impairments: bilateral epicondylitis, bilateral carpal tunnel syndrome, residuals of fracture and surgery to the left ankle (since October of 2005), asthma, and a depressive disorder. (Tr. 15).

The ALJ concluded at Step 3 that Plaintiff did not have any impairment or combination of impairments that equals the severity of any impairment described in the Listings. (Tr. 18).

At Step 4, based on Plaintiff's residual functional capacity for a reduced range of light work,[4] ALJ Redmond determined that Plaintiff could not perform his past relevant work as an assembler and forklift operator, since this work is classified by the vocational expert as work that is medium in exertion and unskilled to semiskilled. (Tr. 21).

At Step 5, ALJ Redmond concluded that Plaintiff could perform work that does not require lifting more than ten pounds, does not require sustained fine manipulation with hands, allows Plaintiff an opportunity to periodically get off his feet, is not in a location containing respiratory irritants (such as dust, fumes, and temperature extremes), and does not require production quotas. (Tr. 20). The ALJ further concluded that "[n]o other restrictions are appropriate or supported by the evidentiary record." *Id.*

---

[4] The Regulations define light work as requiring the ability to lift "no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds...." 20 C.F.R. §404.1567(b).

The ALJ's findings throughout his sequential evaluation led him to conclude that, based on the testimony of the vocational expert, Plaintiff's age, education, work experience, and residual functional capacity, Plaintiff has been able to perform jobs that exist in significant numbers in the national economy. (Tr. 22). Accordingly, ALJ Redmond found Plaintiff "not disabled" and not eligible for DIB. *Id.*

### D.    The Appeals Council's Decision

The Appeals Council denied Plaintiff's request for review and, accordingly, the ALJ's decision became the final decision of the Commissioner in this case. (Tr. 5).  The Council considered the reasons Plaintiff disagreed with the ALJ's decision, as well as additional evidence submitted by Plaintiff, but ultimately concluded the information did not provide a basis for changing the ALJ's decision. (Tr. 6).

## IV.   JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines: " whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence."  *Blakley v. Comm'r. of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r. of Social Security*, 478 F3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings.  *Rogers v. Comm'r. of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r. of Social Security*, 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, the ALJ's factual findings are upheld if the substantial-

evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 406 (quoting *Warner v. Comm'r of Social Security*, 375 F.3d 387, 390 (6th Cir. 2004).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . . ." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry, reviewing the ALJ's legal criteria for correctness, may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings.  *Rabbers v. Comm'r. of Social Security*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746.  "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746 and citing *Wilson v. Comm'r. of Social Security*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.    DISCUSSION

### A.    <u>Plaintiff's Contentions</u>

Plaintiff argues that the record demonstrates that he was disabled beginning on July 6, 2004.  Specifically, Plaintiff argues that the ALJ failed to give controlling weight or deference to the opinion of his treating physician, Dr. May.  Plaintiff also argues that the ALJ's determination of his credibility is not supported by substantial evidence and is contrary to law. (*Id.* at 6)  Finally, Plaintiff contends that the ALJ's decision is not

17

supported by substantial evidence because the hypothetical question provided to the

vocational expert did not provide an accurate description of his physical and

psychological limitations and restrictions.  (*Id.* at 7).

### B.   <u>Medical Source Opinions</u>

Plaintiff first argues that the ALJ committed error when he failed to

give either controlling weight or deference to the opinion of Plaintiff's treating physician,

Dr. May.  As a result, Plaintiff contends the decision to deny benefits was not supported

by substantial evidence. (Doc. #8 at 3). In support of this position, Plaintiff relies on a

letter from Dr. May dated August 28, 2007.  In this letter, Dr. May stated the following:

> It is my medical opinion that Mr. Leithauser is unemployable. He
> certainly could not perform any type of repetitive work even in a light or
> sedentary range with either upper extremity. He would have significant
> restrictions as far as standing, walking, climbing, crawling, and lifting
> because of his left ankle injury and subsequent impairment. In my medical
> opinion Mike Leithauser is permanently and totally disabled from any form
> of substantial gainful employment as a result of his current physical
> condition.

(Tr. 48-50, 399-401).

Although this letter was dated August 28, 2007, and therefore existed before the

ALJ's September 2008 decision, it was never considered by the ALJ because Plaintiff did

not submit it into evidence until after ALJ Redmond issued his decision in September

2008. (Doc. #12 at 10).  Accordingly, because the Appeals Council has refused to review

the case, this Court may not consider Dr. May's letter in determining whether the ALJ's

decision is supported by substantial evidence.  *See Foster v. Halter*, 279 F.3d 348, 357

(6th Cir. 2001) ("[E]vidence submitted to the Appeals Council after the ALJ's decision

cannot be considered part of the record for purposes of substantial evidence review."); *see also Cotton v. Sullivan*, 2 F.3d 692, 695-96 (6th Cir. 1993) ("It might seem . . . that the district judge would be free to consider the new evidence that was before the Appeals Council in deciding whether the decision denying benefits was supported by the record as a whole. And of course this is right when the Council has accepted the case for review and made a decision on the merits, based on all the evidence before it, which then becomes the decision reviewed in the courts. It is wrong when the Council has refused to review the case. For then the decision reviewed in the courts is the decision of the administrative law judge.").  Likewise, this Court may not consider the evidence from Dr. Ward, Dr. Howard, Dr. Lowe, and Mr. Johnson, (as outlined above in Section II, Subsection D) because Plaintiff also did not submit these documents until after the ALJ's decision.

Again, the only evidence that will be considered by the Court in determining whether substantial evidence exists to support ALJ Redmond's decision is evidence submitted to the ALJ prior to his September 2008 decision.

Upon consideration of the evidence submitted by Plaintiff before the ALJ's decision (as outlined above in Section II, Subsection C), the Court finds that substantial evidence supports the ALJ's finding that Plaintiff is not disabled, as well as the subsequent denial of benefits.  Plaintiff contends that the ALJ erred by not giving substantial weight to Dr. May's letter dated August 28, 2007, however, as previously discussed, this letter was not submitted to the ALJ for review prior to his September 2008

decision and therefore cannot be considered by this Court. Accordingly, based on the evidence before him, ALJ Redmond correctly noted that "[n]o physician has reported that the claimant is disabled, nor has any treating or examining source reported that the claimant cannot use his upper extremities to perform work activity, such as pushing, pulling, lifting, and carrying." (Tr. 19).

Objective and clinical findings also support the ALJ's determination that Plaintiff "retains the ability to lift 10 pounds and perform work activity that does not involve sustained fine manipulation." *Id.* For example, in January 2005, John R. Orban, P.T., performed a functional capacity evaluation of Plaintiff and stated that Plaintiff's "physical demand level of work would be categorized as light for all of the other lifting and carrying activities," and that he "did not have any problems with walking, stair climbing or balancing." (Tr. 225-26). Likewise, in February 2005, Plaintiff's treating physician, Dr. May, released Plaintiff to return to work with restrictions. (Tr. 335)

Later, in June 2005, Steven S. Wunder, M.D., indicated "there would be no reason for temporary total disability from 03/21/05 to 08/18/05 causally related to the allowed conditions in this claim." (Tr. 262). Dr. Wunder opined "[t]he only recommendation has been activity modification which was also advised over a year ago." *Id.* In July 2005, Dr. Charles Derrow, a state agency physician, reviewed Plaintiff's medical records and stated Plaintiff could perform medium work with limited use of fingers for fine manipulation, and limited climbing of ladders, ropes, and scaffolds. (Tr. 285-90). In August 2005, Dr. May indicated in a response to a request from Honda for information clarifying Plaintiff's

20

medical request at work, that although Plaintiff was not able to perform his past work, he was able to perform other less physically demanding employment, consistent with the restrictions implemented in April 2005 by another physician. (Tr. 327-28).  Likewise, an EMG performed in September 2005 of Plaintiff's left hand, showed evidence of mild, recurrent carpal tunnel syndrome, and no denervation. (Tr. 323). In January 2006, state agency physician, Teresita Cruz, M.D., reviewed and affirmed Dr. Derrow's findings from July 2005. (Tr. 291, 346).

Accordingly, based on all evidence in the administrative record before the ALJ's decision in September 2008, this Court finds that substantial evidence supports the ALJ's finding that Plaintiff is not disabled, as well as the subsequent denial of benefits.

Remand under 42 U.S.C. § 405(g), sentence six, although not requested by Plaintiff, is also not proper. While "[a] court may order a remand for consideration of newly submitted evidence," the plaintiff must show "that the evidence is in fact new, material, and that good cause exists for the claimant's failure to include it in a prior proceeding." *Wirth v. Comm'r of Social Security*, 87 Fed. Appx. 478, 480 (6th Cir. 2003) . Here, even assuming the newly submitted evidence met the first two requirements, no reason whatsoever has been provided by Plaintiff as to why the evidence was not previously submitted to the ALJ.

**C.** **Credibility**

Plaintiff next maintains that the ALJ's determination as to the credibility of Plaintiff was not supported by substantial evidence and is contrary to law.

21

Pain or other symptoms may be severe enough to constitute a disability, if caused by a medical impairment. *See Kirk v. Sec'y of Health & Human Serv.,* 667 F.2d 524, 538 (6th Cir. 1981) (pain alone may constitute a disability); *see also* 20 C.F.R. §404.1529. When evaluating pain or other symptoms, ALJs are required under the Regulations to consider all evidence, including medical history, medical signs and laboratory findings, the claimant's statements, and treating and other medical source opinions. 20 C.F.R. §404.1529(c)(1). Although the Regulations concerning pain and other symptoms are lengthy, the United States Court of Appeals for the Sixth Circuit has enunciated the applicable standard in "a more succinct" two-part analysis. *Felisky v. Bowen*, 35 F.3d 1027, 1038 (6th Cir. 1994). Part one considers "whether there is objective medical evidence of an underlying medical condition." *Id.* (citation omitted). If such objective medical evidence exists, then part two requires consideration of two alternative questions:

1.    Whether objective medical evidence confirms the severity of the alleged pain [or other symptom] arising from the condition; or

2.    Whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain [or other symptom].

*Id.* at 1038-39 (citation omitted). Neither *Felisky's* two-part test nor the Regulations upon which it is based require objective medical evidence of pain itself. *Id.* at 1039. The Regulations promise, "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. §404.1529(c)(2). Consequently, the Regulations

22

require ALJs to consider a list of factors, including the claimant's daily activities; the location, duration, frequency and intensity of pain or other symptoms; precipitating and aggravating factors; type, dosage, effectiveness and side effects of medications taken to alleviate symptoms; treatment, other than medication, obtained for symptom relief; any measures used to alleviate pain (*e.g.*, lying flat, standing fifteen or twenty minutes every hour, sleeping on a board, etc.); and other factors concerning the claimant's functional limitations. 20 C.F.R. § 404.1529(c)(3)(i)-(vii); *see* Social Security Ruling 96-7p.

An ALJ's findings concerning the credibility of a claimant's testimony about his or her pain or other symptoms "are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997). "Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Id*. Through the Rulings, the Commissioner mandates, in part:

> The reasons for the credibility finding must be grounded in evidence and articulated in the determination or decision.  It is not sufficient to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'  It is also not enough for the adjudicator to simply recite the factors that are described in the regulations for evaluating symptoms.  The determination must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

Social Security Ruling 96-7p, 1996 WL 374186.

After generally discussing the factors to be considered in assessing a claimant's statements regarding pain or other symptoms, the ALJ arrived at the following

23

conclusion: "having carefully considered the claimant's allegations in light of the

objective evidence and clinical findings of record, they must be found not to be credible

[and] they cannot be accepted." (Tr. 21).

Upon arriving at his determination regarding Plaintiff's credibility, the ALJ stated

the following:

> A residual functional capacity for the reduced range of light work set
> forth above takes into account the location, duration, frequency, and
> intensity of the claimant's alleged symptoms, as well as precipitating and
> aggravating factors. There is no evidence that medication or treatment
> cause any adverse side effects which could reasonably be expected to
> adversely affect his ability to perform work-related activities. The claimant
> has received only conservative treatment for his impairments since his last
> ankle surgery. Objective testing shows only a mild recurrent bilateral
> carpal tunnel syndrome. Functional capacity testing was well within the
> light exertional range. In addition, the claimant's daily activities are
> consistent with the ability to perform a reduced range of light work activity.
> He is able to perform all household chores, including housecleaning,
> cooking, and shopping. He reported that he visits with friends several times
> per week and that he spends time outdoors gardening. He is able to drive
> without significant limitation. He stated that he cannot lift more than 5
> pounds, but this is not supported anywhere in the evidentiary record.
> Allowing the opportunity to periodically get off his feet takes into account
> his report that he cannot spend more than 10 to 15 minutes at a time on his
> feet. He has a low back impairment, but the record does not support a
> finding that he will continue to experience symptoms or functional
> impairment for a period of 12 consecutive months.

(Tr. 20-21).

Here, the ALJ's assessment of Plaintiff's credibility was supported by substantial

evidence and is not contrary to law. ALJ Redmond considered the factors outlined in the

Regulations, and reached a decision that is reasonable in light of the evidence before him.

For example, the ALJ first determined whether any adverse side effects could reasonably

24

be expected due to Plaintiff's medication. (Tr. 20-21).  As the record did not provide any evidence that Plaintiff's medication would affect his ability to work, *id.*, the ALJ next considered Plaintiff's objective test results and daily activities. *Id.*  After concluding results from the functional capacity testing, as well as Plaintiff's ability to clean, cook, and shop, were consistent with his ability to perform a reduced range of light work, ALJ Redmond considered statements made by Plaintiff regarding his limitations. *Id.*  As the ALJ noted, although Plaintiff stated he could only lift five pounds, such a statement was inconsistent with the objective and clinical findings of record. *Id.*  Plaintiff's ability to only stand for ten to fifteen minutes at a time was considered by ALJ Redmond and addressed in the hypothetical questions he posed to the vocational experts. (Tr. 444, 451-52).

Plaintiff also contends that "ALJ Redmond's opinion as to Plaintiff's credibility was established without all of the evidence," (Doc. #8 at 6), however, as discussed in the previous section, the evidence Plaintiff is referring to was not submitted to the ALJ prior to reaching his decision and therefore cannot be considered by this Court.  (Tr. 4A).  Accordingly, the Court finds there is no reversible error as to the ALJ's assessment of Plaintiff's credibility.

### D. <u>Hypothetical Questions</u>

Plaintiff's final argument is that the hypothetical question provided to the vocational expert did not include an accurate description of Plaintiff's physical and

psychological limitations and restrictions, and therefore, the vocational expert's testimony was improperly used during Step 5 of the sequential evaluation procedure.

A proper hypothetical question accurately describes the claimant "in all significant, relevant respects; for a response to a hypothetical question to constitute substantial evidence, each element of the hypothetical must accurately describe the claimant." *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994); *see Varley v. Secretary of H.H.S.*, 820 F.2d 777, 779 (6th Cir. 1987). "[T]he ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals." *Stanley v. Secretary of H.H.S.*, 39 F.3d 115, 118 (6th Cir. 1994).

Plaintiff contends that "[t]he hypothetical question in this case cannot be relied upon because it does not accurately reflect Plaintiff's capabilities." (Doc. #8 at 8). Plaintiff argues the "hypothetical person described in the hypothetical question did not have impairments to the same degrees as does the Plaintiff." *Id.* According to Plaintiff, the hypothetical question did "not reflect all relevant facts as Plaintiff's treating and examining physician's opinions [were] not taken into account." *Id.* While this may be true regarding the evidence submitted after the ALJ's decision was issued in September 2008, the administrative record clearly shows that the vocational expert was asked a hypothetical question based on evidence in the record at the time.  For example, the ALJ asked vocational expert Eric Pruitt the following hypothetical:

> Using the regional economy as a basis, let's consider a hypothetical in which we'll assume a person of Mr. Leithauser's age, education and work experience and let's suppose that our hypothetical person would be limited to activity at the sedentary exertional level, that he would need the

26

latitude to sit, stand or change positions at will and would not be able to
perform sustained, fine manipulation. He would require a temperature
controlled environment and would not be performing work with production
quotas.

(Tr. 444).  After presented with this hypothetical, Mr. Pruitt stated there would be,

cumulatively, approximately 1,200 jobs available in the region. *Id.* Likewise, ALJ

Redmond asked vocational expert Carlotta Ewers two hypotheticals.  First, the ALJ posed

the following:

> Now, using the regional economy as a basis, let's consider a couple
> of hypotheticals.  First of all, let's assume a person of Mr. Leithauser's age,
> education and work experience and let's suppose that our hypothetical
> person would be limited to activity basically at the light exertional level that
> within the other requirements of light activity he would be limited to lifting
> not more than 10 pounds, would need the latitude to get off his feet for short
> periods, say 15 minutes an hour to relieve discomfort and would not be able
> to perform sustained, fine manipulation and furthermore would require a
> temperature controlled environment and work with no production quotas.
> Now, if you were to make those assumptions, can you identify any positions
> such a person might perform?

(Tr. 451). The ALJ's second hypothetical involved a person with more limitations:

> And, secondly, let's again assume a person of Mr. Leithauser's age,
> education and work experience, but this time let's suppose that our
> hypothetical person would be limited to activity at the sedentary exertional
> level, that he would need the latitude to sit, stand or change positions at will
> and would not be able to perform sustained fine manipulation and would
> require a temperature controlled environment and work featuring no
> production quotas. Now, if you were to make these new assumptions, can
> you identify any positions such a person might perform?

(Tr. 452).

After being provided with the first hypothetical, Ms. Ewers stated, "[j]obs that fit

your hypothetical at the light level would number approximately 20,000." *Id.*  Upon being

27

asked the hypothetical with the more limited worker, Ms. Ewers stated there would be approximately 4,000 "[j]obs that fit your hypothetical." *Id.*

Plaintiff contends, "[t]hese hypothetical persons relied upon by the experts are based on the file review by the DDS physician who completed the RFC assessment, not based on an accurate summation of all of the evidence of record." (Doc. #8 at 8). As a result, Plaintiff argues "[t]his deprives the vocational experts the opportunity to develop a meaningful opinion." *Id.* Plaintiff further states that "[t]hese vocational experts' opinions may be reliable for the hypothetical person described by ALJ Redmond but are not in any way a reliable account with respect to Plaintiff Leithauser." *Id.* According to Plaintiff, "the proper hypothetical could not be posed to the vocational expert because of the inaccurate RFC assessment." (Doc. #8 at 9).

Furthermore, Plaintiff contends "[a] reliable baseline RFC assessment could not be performed because the physician did not have an accurate history from Plaintiff's treating and examining doctors." *Id.* While it is possible the RFC may have been different had the physician had an "accurate history from Plaintiff's treating and examining doctors," this evidence was not submitted by Plaintiff. Accordingly, the physician who completed the RFC, Dr. Derrow, only was able to base his assessment upon the evidence in the record. Based on this evidence, however, the Court finds the evidence relied upon in the RFC is supported by the record.

For example, Dr. Derrow stated the following about Plaintiff:

> 36 year old alleging CTS, asthma, and epicondylitis of the elbow.
> AOD 7/6/04. X-rays of the UE's showed osseous structures intact, but there

28

was some scarring within the subcutaneous fat. Clmt had L. carpal tunnel release 3/03 and the right side was released 1/03. Exam 6/04 showed FROM in the UE's. Tenderness over the epicondyle. X-rays of both elbows unremarkable. X-rays 2/05 and 3/05 of L. Wrist and elbow negative. EMG 4/05 showed R. carpal tunnel syndrome with no denervation. No ER visits for asthma in the MER, and clmt reports that the asthma is controlled with inhalers.

Again, evidence submitted after the ALJ's decision in September 2008 may have changed the RFC, however, it was never submitted by Plaintiff. Accordingly, as the RFC is supported by evidence in the record, the hypothetical persons based upon this RFC are likewise proper. Since Plaintiff does not challenge the accuracy of the vocational experts' opinions, ALJ Redmond did not err when using the vocational experts' testimony at Step 5.

## IT IS THEREFORE RECOMMENDED THAT:

1.      The Commissioner's final non-disability determination be **AFFIRMED**; and,

2.      The case be terminated on the docket of this Court.


August 5, 2011                                      ___s/Sharon L. Ovington___
                                                    Sharon L. Ovington
                                                    United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen (14) days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen (17) days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).